JENKS [EXRX.], APPELLANT, *v.* CITY OF WEST CARROLLTON; YOUTH DRUG PROGRAM, APPELLEE.

(No. 10788—Decided
June 15, 1989.)

*Terry L. Lewis,* for appellant.
*David E. Beitzel,* for appellee.

GRADY, J. This matter comes on appeal from a jury verdict in the court of common pleas adverse to plaintiff-appellant, Arlene Jenks, and in favor of defendant-appellee, Youth Drug Program. Appellant's two assignments of error concern the trial court's charges on instructions to the jury.

Arlene Jenks brought an action for wrongful death arising from the killing of her son, David Jenks, age thirteen. David was raped and murdered on June 25, 1983, by James Louden, age eighteen.

Louden had, from an early age, a history of drug use and other criminal activity, including acts of violence. In July 1979, Louden was adjudicated delinquent and committed to the custody of the Ohio Department of Youth Services.

After three years, Louden was paroled and placed in the custody of the Youth Drug Program, a private agency funded by the mental health board and the Ohio Youth Commission. The Youth Drug Program provides both residential and outpatient care and treatment. The program provides a structured system of rewards and punishments to deter misconduct and promote socially acceptable behavior. Louden began as a resident in the program.

The Youth Drug Program was aware of Louden's history of violence and criminal activity. While a resident in the program, Louden threatened another inmate with a baseball bat. On another occasion he threatened another resident with violence. He was allowed to visit his sister, but admitted to use of drugs while doing so. The program was also aware that Louden had a serious problem of sexual identity. The view was developed, however, that Louden had made progress in controlling his negative behavior and that, by April 15, 1983, his long-term residential treatment goals had been met. Psychological testing indicated that Louden was in the normal range of behavior.

The next step in Louden's treatment was outpatient care. The Youth Drug Program, with the approval of the Ohio Department of Youth Services, placed Louden in foster care with the Cooper family, who also had a son in the program. The Cooper family was not made aware of Louden's history of violence or his sexual identity problem. The Youth Drug Program told the Coopers that Louden was in

the program for "a few B & E's and breaking probation."

While with the Coopers, Louden was supervised by a parole officer of the Ohio Department of Youth Services, who observed no problems. Mrs. Cooper observed, however, that Louden was becoming depressed and isolated, and she called the Youth Drug Program on several occasions to advise them of the fact. A clinical psychologist, John Korte, who had been a consultant with the Youth Drug Program, confirmed that Louden began to deteriorate after leaving the residential program. However, no change was made in Louden's case plan.

Several weeks prior to the murder, the Coopers were told by their son that Louden threatened a young neighbor boy with a knife. Louden gave the knife to Mr. Cooper when asked to do so. The Youth Drug Program was advised of the event. The Coopers and the program only learned after the murder that this earlier act also involved rape.

Mrs. Cooper made several telephone calls to the Youth Drug Program prior to June 25, 1983, to advise the program of Louden's problems. The program took no action. On June 25, 1983, Louden raped, repeatedly stabbed, and murdered David Jenks, a neighbor.

Dr. Korte testified at trial that, based on his experience and review of the case, there was no way to predict with any accuracy that Louden would commit murder, and that in his opinion the counsellors at the Youth Drug Program did not deviate from the applicable standard of care in their treatment of Louden. However, immediately after the killing, Jeff Chandler, a counsellor on the program staff, told the Coopers "they knew Louden was going to snap but they didn't know when."

Testimony presented at trial supported the view that the Youth Drug Program was prohibited by law from giving out to anyone information received about Louden from the Ohio Department of Youth Services, which was the party responsible to counsel foster families concerning a foster child's past history and emotional problems.

Arlene Jenks brought an action for wrongful death against the Youth Drug Program and the city of West Carrollton. The claims against West Carrollton were settled and dismissed, with prejudice. Trial was had of the claims against the Youth Drug Program. After five days of trial ending November 2, 1987, the jury found in favor of the Youth Drug Program.

Plaintiff-appellant perfected her appeal, and makes two assignments of error:

### First Assignment of Error

"The trial court should have properly instructed the jury that the standard of care utilized by the appellee must meet the professional judgment standard."

Appellant argues that the court's instruction concerning the alleged negligence of the Youth Drug Program should properly have included recitations consistent with the decision of the Ohio Supreme Court in *Littleton* v. *Good Samaritan Hospital & Health Ctr.* (1988), 39 Ohio St. 3d 86, 529 N.E. 2d 449. We agree that *Littleton* now sets out the applicable rule for malpractice of a physician, hospital, or other health care professional or program that has a "special relation" to a patient or client which imposes a duty on the actor to control the conduct of the patient or client. *Littleton, supra,* at 92, 529 N.E. 2d at 455, citing *Gelbman* v. *Second Natl. Bank of Warren* (1984), 9 Ohio St. 3d 77, 79, 9 OBR 280, 281-282, 458 N.E. 2d 1262, 1263. However, *Littleton* was decided on Oc-

tober 12, 1988 and the instructions of the trial court below were given on November 2, 1987. The trial court did not ignore precedent, therefore. Any error adequate to mandate reversal must be evident from the extent to which the instructions given failed to provide the jury with a view of the alleged negligence consistent with the scope set out in *Littleton.*

The court's instructions to the jury were extensive. The court gave instructions on reasonable care and probable cause. The jury was instructed that the complaint alleged that the Youth Drug Program was negligent in its care and treatment of Louden in failing to use reasonable care to protect David Jenks from Louden. On the question of negligence, the court stated:

"A special relationship between a psychologist, therapist or counselor and the person being treated imposes a duty upon the former to use reasonable care to protect a potential victim if the professional knew or should have known that the person being treated presented a serious danger of violence for others or was likely to cause harm to others.

"A therapist in the performance of his or her professional responsibilities has the duty to exercise that degree of skill, knowledge, and care ordinarily possessed and exercised by members of that specialty under the same or similar circumstances. That is, he has the duty to exercise reasonable care in the diagnosis and treatment of Louden.

"* * *

"In determining whether reasonable care was used, you will consider whether defendant ought to have foreseen under the circumstances that the natural and probable results of an act or failure to act would cause someone to be injured or killed.

"The test for foreseeability is not whether defendant should have foreseen the rape and murderer [*sic*] precisely as they happened to David Jenks. The test, rather, is whether under all the circumstances a reasonably cautious, careful and prudent person would have anticipated that serious injury or death was likely to result to someone * * *."

As to whether the Youth Drug Program negligently failed to prevent harm caused by a person with dangerous propensities, the court's charge was as follows:

"One who takes charge of another whom he knows or should know to be likely to cause bodily harm to another, if not controlled, is under a duty to exercise reasonable care to control that person to prevent him from doing such harm.

"To find for plaintiff on this issue, you must find by a preponderance of the evidence:

"Number one, that the defendant Youth Drug Program had James Louden in its charge. To find that Louden was in the charge of the defendant, you must find that he was placed with the defendant by the Ohio Department of Youth Service[s] for the purpose of drug rehabilitation and for psychological counseling or treatment.

"Number two, that the defendant knew or in the exercise of ordinary — or I'm sorry, in the exercise of reasonable care should have known that Louden was likely to cause bodily harm. In making that determination, you will consider whether defendant through its employees or agents used that degree of skill, knowledge and care ordinarily possessed and exercised by therapists under the same or similar circumstances, to predict that Louden was likely to cause bodily harm if that prediction could be made at all."

The instructions given by the trial court pattern the malpractice standard of care set out in *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127, 75 O.O. 2d

184, 346 N.E. 2d 673, at paragraph one of the syllabus:

"In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."

The standard of care for a medical specialist such as a psychiatrist is also stated in *Bruni* as "that of a reasonable specialist practicing medicine or surgery in that same specialty in the light of present day scientific knowledge in that specialty field * * *." *Id.* at paragraph two of the syllabus.

The negligence claim before us, as did the negligence claim in *Littleton,* presents a loss suffered not by the patient but by a third party whom the patient has harmed. The health care provider has no duty to that third party, unless it can be shown that he has a "special relation" to his patient which imposes a duty on him to control the patient's conduct. ¨"* * * Such a 'special relation' exists when one takes charge of a person whom he knows or should know is likely to cause bodily harm to others if not controlled. * * *" *Littleton, supra,* at 92, 529 N.E. 2d at 455, citing 2 Restatement of the Law 2d, Torts (1965) 129, Section 319, and Section 315, Comment *c,* at 123.

It is clear and beyond question that the Youth Drug Program took charge of Louden in its care and treatment of him, both as a resident and an outpatient.[1] The record is fully adequate to support a finding that the Youth Drug Program knew or should have known of Louden's violent propensities. Therefore, a "special relation" did exist between Louden and the Youth Drug Program, and the latter had a duty to control Louden's conduct to protect persons in the position of David Jenks from Louden's violent propensities.

The Supreme Court in *Littleton* did not abandon or reduce the standard of care defined in *Bruni* quoted above. Rather, recognizing the great difficulty inherent in psychiatric evaluations and treatment plans, and the right of patients to be protected from unnecessary confinement by a psychiatrist fearful of liability to third persons, the court adopted the "professional judgment rule":

"* * * Where there are professional standards of care a psychiatrist is required to conform to the standards at all times or suffer liability. Where there are no professional standards, a psychiatrist must exercise good faith judgment based on a thorough evalua-

[1] The Supreme Court stated in *Littleton, supra,* at 92, 529 N.E. 2d at 455, at fn. 3: "We are not deciding whether a psychiatrist's duty to protect a person from the violent propensities of the psychiatrist's patient extends to the outpatient setting. * * *" Though Louden was an outpatient when he killed Jenks, the notice and degree of control gained by the Youth Drug Program in its prior inpatient care of Louden, coupled with the continuing supervision assumed after he entered foster care, cause us to conclude that the rule in *Littleton* should apply because a "special relation" did exist. *Littleton* itself, furthermore, presented a similar set of facts, *i.e.,* a situation where a patient committed a homicide after release from inpatient care to an outpatient, supervised setting.

tion of all relevant factors. Professional standards will be used to determine which factors are relevant and whether an evaluation was thorough.

"Therefore, we hold that a psychiatrist will not be held liable for the violent acts of a voluntarily hospitalized mental patient subsequent to the patient's discharge if (1) the patient did not manifest violent propensities while being hospitalized and there was no reason to suspect the patient would become violent after discharge, or (2) a thorough evaluation of the patient's propensity for violence was conducted, taking into account all relevant factors, and a good faith decision was made by the psychiatrist that the patient had no violent propensity, or (3) the patient was diagnosed as having violent propensities and, after a thorough evaluation of the severity of the propensities and a balancing of the patient's interests and the interests of potential victims, a treatment plan was formulated in good faith which included discharge of the patient." *Littleton, supra* (39 Ohio St. 3d), at 99, 529 N.E. 2d at 460.

Under the professional judgment rule the psychiatrist or other provider is not required to assume the risk of improper treatment. Under the rule, "grounds [for liability], including premature discharge and failure to warn, can be a basis for liability only in the absence of good faith or a failure to exercise professional judgment. * * *" *Id.* at 100, 529 N.E. 2d at 461.

The professional judgment rule does not impose additional or more substantial duties of care on a psychiatrist or similar health care provider against whom a negligence claim is made by a third party for injuries inflicted by a patient. Rather, it provides additional defenses where there is no discernible standard of reasonable care the provider must meet.

Testimony from Dr. Korte presented by the Youth Drug Program supports the conclusion that standards of care did exist governing Louden's care and treatment and that the Youth Drug Program's actions did not fall below that standard. No contrary expert testimony was offered. Having heard all of the testimony and reviewed all of the exhibits, the jury found that the Youth Drug Program exercised reasonable care in diagnosing and treating Louden and that under the circumstances in the exercise of due care it was not foreseeable to the Youth Drug Program that Louden would harm or kill David Jenks. Interrogatories submitted to the jury indicate that the jury found that no act or omission by the Youth Drug Program proximately caused the murder of David Jenks and that the Youth Drug Program did not negligently release Louden to live in the foster home setting at the Cooper residence.

The professional judgment rule does not displace the rule of *Bruni* but, instead, supplements it. The traditional malpractice rule applies in situations in which standards of care may be determined. Where they cannot, the professional judgment rule offers the basis for determination of liability.

The professional judgment rule imposes a less stringent duty of care than the traditional malpractice rule of *Bruni.* One who is determined *not* negligent under *Bruni* standards is, therefore, not negligent under the professional judgment rule. The scope of the former includes the latter.

The jury found no liability when weighing the actions of the Youth Drug Program under the *Bruni* rule, and it could therefore find no liability under the lesser professional judgment rule. Giving those instructions on the professional judgment rule could not have rationally produced a different result; if the Youth Drug Program acted in bad faith or failed to exercise professional judgment in releasing Louden or failing to warn of his violent

propensities, evidence adequate to support either conclusion would produce a finding adverse to the Youth Drug Program under the instructions given. It did not, and failure to offer those additional instructions is not reversible error.

Whether the additional instructions are required in future cases raising the same issues is not determined in this opinion. In almost all cases defendants will request them and will probably benefit from them. The better approach would be first to give the *Bruni* rule, and then to give the professional judgment rule in the charges to the jury, instructing that defenses under both are available to defendants and that a finding under the former of no liability will eliminate the need for consideration of the professional judgment rule and its defenses.

Appellant's first assignment of error is not well-taken.

### Second Assignment of Error

"Where it is unrefuted that the treating agency made fraudulent misrepresentations to a foster family, to induce the foster family to accept the patient, the treating agency is liable for intentional or negligent misrepresentations."

Jenks argues that she requested instructions on misrepresentation but that the court refused to grant such an instruction.

Civ. R. 51(A) states in pertinent part:

"A party may not assign as error the giving or the failure to give any instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

The Ohio Supreme Court in *Schade* v. *Carnegie Body Co.* (1982), 70 Ohio St. 2d 207, 24 O.O. 3d 316, 436 N.E. 2d 1001, at paragraph one of the syllabus, states:

"When a party fails to object to the giving of or failure to give a jury instruction before the jury retires to consider a verdict, the party may not assign as error the giving of or failure to give such instruction."

A failure to object formally and timely as required by Civ. R. 51(A) is not an absolute bar to appeal, however:

"Where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and that the complaining party has unsuccessfully requested the inclusion of that law in the trial court's charge to the jury, such party does not waive his objections to the court's charge by failing to *formally* object thereto. * * *" (Emphasis *sic.*) *Presley* v. *Norwood* (1973), 36 Ohio St. 2d 29, 65 O.O. 2d 129, 303 N.E. 2d 81, paragraph one of the syllabus.

Further, some federal courts apparently have recognized that exceptions to a similar requirement in Fed. R. Civ. P. 51 may be made for good cause, but "only in circumstances where the error has seriously affected the basic fairness, integrity, or public reputation of the judicial process. * * *" See *Yungwirth* v. *McAvoy* (1972), 32 Ohio St. 2d 285, 288, 61 O.O. 2d 504, 505-506, 291 N.E. 2d 739, 741.

Prior to the close of the evidentiary portion of the trial, counsel for appellant provided the court with the requested instruction on fraudulent misrepresentation. At a conference in chambers on November 2, 1987, the court rejected the requested instruction. The record does not include a copy or recitation of that requested instruction. No objection was made by appellant at that time or before the jury retired.

It appears from the argument of appellant in support of her assignment of error that the theory embodied in

the liability alleged and set out in the requested instruction arises from 2 Restatement of the Law 2d, Torts (1965), Sections 310 and ·311. Appellant concedes that no Ohio court has specifically adopted either section.

The theory behind the requirements of Civ. R. 51(A) is "* * * 'that the [trial] court should be given an opportunity to correct a mistake or defect in the instruction when it can be accomplished during the same trial.' * * *" *Presley* v. *Norwood, supra,* at 32-33, 65 O.O. 2d at 131, 303 N.E. 2d at 84. We would add that the process of objection and argument of grounds is necessary for our determination of error in the trial proceedings, absent which we cannot reverse or modify.

Because the record does not affirmatively show that the trial court was fully apprised of the correct law, and in the absence of a clear showing of error that seriously affects the basic fairness, integrity, or public reputation of the judicial system, we cannot find an exception to the requirements of Civ. R. 51(A). Appellant did not raise a timely objection to the court's failure to give the instruction to the jury, and cannot now raise that matter as error.

The Youth Drug Program's motion to require appellant to pay for costs of the transcript must be addressed at this time pursuant to our October 12, 1988 decision and entry.

The Youth Drug Program maintains that Jenks should be ordered to pay for the entire transcript because Jenks did not follow App. R. 9(B), which states in pertinent part:

"At the time of filing the notice of appeal the appellant shall in writing order from the reporter a complete transcript or a transcript of such parts of the proceedings not already on file as he deems necessary for inclusion in the record and shall file a copy of said order with the clerk. * * * Unless the entire transcript is to be included, or if no transcript is necessary, or if a statement pursuant to either Rule 9(C) or 9(D) is ·to be prepared in lieu of a transcript, the appellant shall, with his notice of appeal, file with the clerk of the trial court and serve on the appellee a description of the parts of the transcript which he intends to include in the record or a statement that no transcript is necessary or that a statement pursuant to either Rule 9(C) or 9(D) will be submitted, and a statement of the assignments of error he intends to present on the appeal. If the appellee deems a transcript of other parts of the proceedings to be necessary he shall, within ten days after the service of the statement of the appellant, file and serve on the appellant a designation of additional parts to be included. The clerk of the trial court shall forward a copy of this designation to the clerk of the court of appeals.

"If the appellant shall refuse, or fail within ten days after service upon him of appellee's designation, to order such parts, the appellee within five days thereafter, shall either order the parts in writing from the reporter or apply to the court of appeals for an order requiring the appellant to do so. At the time of ordering, a party shall arrange for the payment to the reporter of the cost of the transcript."

Appellant Jenks filed her notice of appeal on January 7, 1988. From the record it appears that appellant did not order a transcript from the court reporter until March 17, 1988, and then only a partial transcript. Further, appellant did not file a copy of the request with the court or serve a copy on the appellee, as required by App. R. 9(B).

Appellee, not knowing whether appellant had ordered a full transcript, ordered a full transcript. Appellee claims that, as the time for designation of further portions had expired, it had no choice but to order a full transcript to protect its own interests. The cost to appellee was $273.60.

Both counsel for appellant and counsel for appellee state by affidavit that they made several attempts to reach the other by telephone to discuss the matter, but without success.

We cannot agree that appellee is entitled to receive reimbursement from appellant for costs of the transcript ordered by appellee. Appellant's failure to follow the requirements of App. R. 9(B) produced uncertainty in appellee's mind whether it ought to seek additional transcriptions. Appellant's failure was a matter that should have been brought to the attention of the court prior to any expiration of the time concerned. From the statements of the parties, it appears that a motion to compel appellant to designate parts of the transcript ordered would likely have solved the problem. By going forward unilaterally to order its own transcript, appellee assumed the obligation to pay for same.

Appellee's motion to require appellant to pay for costs of its transcript is not well-taken and is denied.

*Judgment affirmed.*

BROGAN and FAIN, JJ., concur.