[Cite as *Piper v. Bruno*, 197 Ohio App.3d 126, 2011-Ohio-5874.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

PIPER,

    APPELLANT,                              CASE NO. 1-11-07

    v.

BRUNO,                                   O P I N I O N

    APPELLEE.

Appeal from Allen County Common Pleas Court

Trial Court No. CV 2009 0892

**Judgment Affirmed**

Date of Decision: November 14, 2011

APPEARANCES:

    Gregory D. Wilson and Eric J. Wilson, for appellant.

    Michael J. Manahan and Kate E. Schuyler, for appellee.

Case No. 1-11-07

**SHAW, Judge.**

{¶ 1} Plaintiff-appellant, Ronald Piper, appeals the December 20, 2010 judgment of the Common Pleas Court of Allen County, Ohio, granting summary judgment in favor of defendant-appellee, Dr. Eddy Bruno, and dismissing his complaint.

{¶ 2} The facts relevant to this appeal are as follows. On August 26, 2008, in Celina, Ohio, Piper's two adult sons deliberately crashed their vehicle into Piper's vehicle to prevent him from driving. Their stated reason for doing so was concern for the safety of their mother, sister, and Piper, because Piper had told one of his sons that he was going to shoot Karen (Piper's wife), Stephanie (Piper's daughter), and himself. The sons also reported that Piper had told his sons that he loved them and that he hoped that the sons did not hate him for doing those things. They also reported that after going through his property and belongings, Piper had told them what needed to be taken care of.

{¶ 3} The Celina Police Department was contacted and made aware of what had transpired. Officers then took Piper into custody and transported him to Westwood Behavioral Health Center, Inc. ("Westwood"), for a mental-status evaluation. According to Westwood's records, Piper was evaluated by a health officer and licensed social worker named B. Schmersal shortly after midnight on August 27, 2008. Schmersal noted the reason Piper was at Westwood, including

the statements he had purportedly made to his sons. He also noted that Piper denied any suicidal or homicidal thoughts and claimed that his family was "crazy" and that they were the ones who needed help. After a consultation with Dr. Antoine Demosthene, a licensed psychiatrist, the crisis plan/recommendation was to hospitalize Piper in the psychiatric unit at St. Rita's Medical Center ("St. Rita's") in Lima, Allen County, Ohio, on an emergency certificate. Piper was then transported to St. Rita's.

{¶ 4} Later that same morning, Dr. Bruno, a licensed psychiatrist, met with Piper for the first time to conduct a psychiatric examination/assessment of him. Dr. Bruno found Piper to be quite upset and uncooperative initially. Piper denied any suicidal or homicidal thoughts and refused to accept treatment of any kind. Dr. Bruno also attempted to speak with Piper's wife that day, but she was not available, and he did not have any contact information for Piper's children. At some point after that initial meeting, Dr. Bruno determined that Piper was mentally ill and that he needed more time to further observe Piper and to assess him. That afternoon, Dr. Bruno was informed that Piper and his attorney wanted to speak with him. Dr. Bruno met with them as requested.

{¶ 5} The following day, August 28, Dr. Bruno spoke with Piper's wife, Karen, and his son, Steve. They confirmed that Piper had threatened to kill Karen, Stephanie, and himself and that the sons had crashed their vehicle into Piper's to

stop him from driving. Dr. Bruno testified in his deposition that Karen expressed that she was very scared and feared for her life. He also examined Piper that day, and Piper once again denied any suicidal or homicidal thoughts and declined any treatment.

{¶ 6} On August 29, 2008, Dr. Bruno filed a certificate of examination and affidavit with the Allen County Probate Court, asserting that Piper was mentally ill and subject to hospitalization by court order because he represented a substantial risk of physical harm to himself and to others as manifested by evidence of threats of suicide and threats to others, causing them to be placed in reasonable fear of harm. Dr. Bruno further attested that Piper would benefit from treatment in a hospital for his mental illness and was in need of that treatment as evidenced by his behavior, which created a grave and imminent risk to the substantial rights of others or himself. A hearing was scheduled on this matter for September 2, 2008. In addition, at the request of Piper's attorney, Dr. Thomas Hustak, a licensed clinical psychologist with over 30 years of experience, was appointed by the probate court to conduct a psychological evaluation of Piper and to report his findings to the probate court at the hearing.

{¶ 7} Dr. Bruno continued to observe Piper throughout his time at St. Rita's. On August 30, 2008, he requested that Piper receive psychological testing from Dr. Frederick Ferri, a licensed clinical psychologist, or Dick Scherger, by

leaving a message with them. At this time, Dr. Bruno did not know that the court had ordered such an examination from Dr. Hustak. On that same day, Piper's blood-sugar level was very high, and he was seen by Dr. Hovest, an internal-medicine doctor, who diagnosed him as suffering from diabetes. Although Piper was told that he needed insulin, he refused this treatment and stated that he would take care of his diabetes once he was released from St. Rita's. Eventually, Piper agreed to take oral medication for diabetes, but he continued to refuse to receive insulin. Piper again denied to Dr. Bruno that he had any suicidal or homicidal thoughts. He also refused to attend any group-therapy sessions. However, at this point, he was engaging more with the hospital staff.

{¶ 8}   The next day, Dr. Bruno visited with Piper again. Although Piper continued to refuse medication or to attend group therapy, he had begun to talk and joke with the hospital staff. That day, Dr. Bruno read a letter that he had received from Piper's attorney, which stated that counsel had been personal friends with Piper since 1983, that he had spoken with Karen and Piper's children, who did not believe he was mentally ill and did not want to go through with the hearing on September 2, 2008, that counsel had been advocating for Karen and Piper to dissolve their marriage for years, and that the family had developed a plan for Piper's release. This plan consisted of Stephanie moving out of the home near the family business, Piper moving into that home, Karen remaining in the marital

home, and Karen and Piper filing a petition for dissolution of their marriage. In addition, Piper agreed to be examined, counseled, and treated by Dr. Hustak. Thus, counsel for Piper requested that Dr. Bruno change Piper's status to that of a voluntary patient so that he could be discharged. Dr. Bruno did not change Piper's status at that time. He testified that given his conversation with Karen and Steve on August 28, the level of fear Karen expressed to him, and the fact that neither she nor Piper's sons contacted him despite having his contact information, he did not believe that the family was part of this plan.

{¶ 9} On September 1, 2008, Dr. Bruno learned through the hospital staff that Dr. Hustak was there to conduct a court-ordered psychological examination of Piper. Dr. Bruno spoke with Piper, who again denied that he had any suicidal or homicidal thoughts and refused to receive insulin. However, Piper continued taking the oral medication he was given for his diabetic condition.

{¶ 10} The following day, Dr. Bruno requested that the case for involuntary hospitalization be dismissed. He testified in his deposition that he had observed Piper improve each day that he was in St. Rita's, that Piper interacted more with the staff, that Piper no longer exhibited anger, and that Piper was more cooperative. In addition, just prior to the hearing, Dr. Bruno was informed by counsel for the Mental Health Board that Dr. Hustak was going to testify. At that time, Dr. Bruno surmised that Dr. Hustak was going to testify that Piper was not

mentally ill. At Dr. Bruno's request, the probate court dismissed the case, and Piper was released from St. Rita's.

{¶ 11} On August 27, 2009, Piper filed a complaint in the Common Pleas Court of Allen County, Ohio, against Dr. Bruno, alleging four causes of action stemming from his hospitalization at St. Rita's the previous year: false imprisonment, malicious prosecution, abuse of process, and intentional infliction of serious emotional distress. Dr. Bruno filed an answer to this complaint, denying any wrongdoing and including the affirmative defense that he was immune from liability pursuant to R.C. 5122.34(A).

{¶ 12} The case proceeded through discovery, and Dr. Bruno filed a motion for summary judgment based upon his defense that he was immune from liability. Piper filed a response in opposition to this motion, asserting that Dr. Bruno did not act in good faith in continuing his hospitalization of Piper. Dr. Bruno filed a reply to this response and attached the affidavit of Dr. Stephen Noffsinger, a licensed psychiatrist in the state of Ohio. Dr. Noffsinger opined, based upon his review of the case, including the discovery materials, that Dr. Bruno had met the standard of care of a psychiatrist in regard to his evaluation, commitment, and attempts to treat Piper, that Dr. Bruno had conducted a reasonable psychiatric evaluation of Piper in good faith, and that Dr. Bruno was justified in filing an affidavit with the court to allow Piper's continued hospitalization.

{¶ 13} On December 22, 2010, the trial court granted summary judgment in favor of Dr. Bruno and dismissed Piper's complaint. This appeal followed, and Piper now asserts two assignments of error.

**ASSIGNMENT OF ERROR I**

The court erred in granting summary judgment to defendant, declaring that the defendant acted in good faith and was entitled to immunity.

**ASSIGNMENT OF ERROR II**

The court erred by granting summary judgment when the parties agreed to a reply brief by defendant that attached new evidence that plaintiff did not get a chance to respond to.

{¶ 14} Because these assignments of error are interrelated, we elect to address them together.

{¶ 15} An appellate court reviews a grant of summary judgment de novo, without any deference to the trial court. *Conley-Slowinski v. Superior Spinning & Stamping Co.* (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991; see also *Hasenfratz v. Warnement*, 3rd Dist. No. 1-06-03, 2006-Ohio-2797, 2006 WL 1519921, citing *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 572 N.E.2d 198. A grant of summary judgment will be affirmed only when the requirements of Civ.R. 56(C) are met. This requires the moving party to establish that there are no genuine issues of material fact, that the moving party is entitled to judgment as a matter of law, and that reasonable minds can come to but one

conclusion, and that conclusion is adverse to the nonmoving party, that party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); see *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. Additionally, Civ.R. 56(C) mandates that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

{¶ 16} The issue before this court is whether Dr. Bruno was immune from civil liability as a matter of law for his continued hospitalization of Piper. The portion of the Revised Code that concerns the hospitalization of mentally-ill persons provides that

> (A) Persons * * * acting in good faith, either upon actual knowledge or information thought by them to be reliable, who procedurally or physically assist in the hospitalization or discharge, determination of appropriate placement, or in judicial proceedings of a person under this chapter, do not come within any criminal provision, and are free from any liability to the person hospitalized or to any other person.
>
> * * *
>
> (D) The immunity from liability conferred by this section is in addition to and not in limitation of any immunity conferred by any other section of the Revised Code or by judicial precedent.

R.C. 5122.34(A) and (D). Piper contends that Dr. Bruno did not act in good faith by continuing his hospitalization.

{¶ 17} "The good faith rule of R.C. 5122.34 creates a subjective standard of conduct which avoids any liability that otherwise results from a defendant's breach of a duty of care arising from an involuntary commitment or a release therefrom." *Loughran v. Kettering Mem. Hosp.* (1998), 126 Ohio App.3d 468, 474, 710 N.E.2d 773. Further, "[i]t is a 'professional judgment' rule that acknowledges '[t]he inherent difficulty of predicting violent behavior, coupled with the degree of variability exhibited by psychiatrists in clinical practice.' " *Id.*, quoting *Nolan, Ohio Adopts the Professional Judgment Rule* (1990), 15 Dayton L.Rev. 319, 332.

{¶ 18} In determining whether a psychiatrist acted in good faith, a number of factors are to be considered, which include the competence and training of the psychiatrist, " 'whether the relevant documents and evidence were adequately, promptly and independently reviewed, whether the advice or opinion of another therapist was obtained, whether the evaluation was made in light of the proper legal standards for commitment, and whether other evidence of good faith exists.' " *Loughran* at 474, quoting *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 96, 529 N.E.2d 449 (reviewing psychiatrist's decision to release a patient who subsequently murdered her infant after having

expressed a desire to do so while hospitalized). Thus, "the defendant's acts or omissions are weighed to determine whether he or she acted on the basis of a judgment, honestly arrived at, that the subject should be committed or released, as the case may be." *Loughran* at 474. Once a defendant-psychiatrist has made a prima-facie showing of good faith, the burden shifts to the plaintiff to show that "no reasonable psychiatrist would have committed the patient under the circumstances." *Johnson v. Patel*, 5th Dist. No. 2006AP100058, 2008-Ohio-596, 2008 WL 399022, ¶ 42, citing *Loughran*.

{¶ 19} Here, Dr. Bruno's affidavit stated that he had received his medical degree in 1992 from the Université d'État d'Haiti. From January 2001 until December 2004, he completed his four-year residency program in psychiatry at the Medical College of Ohio. He is a board-certified psychiatrist and has been licensed to practice medicine in Ohio since 2004. He has practiced in the Lima, Ohio area since 2005 and has been the Medical Director of Westwood since February 2006.

{¶ 20} Dr. Bruno testified that he reviewed Westwood's records of the mental-status evaluation of Piper that its licensed social worker, B. Schmersal, conducted on the night Piper was brought to them after his two sons wrecked their vehicle into his to prevent him from driving after he called to tell one of them that he was going to kill his wife, his daughter, and himself. Both Schmersal and the

consulting psychiatrist, Dr. Demosthene, concluded that Piper needed emergency hospitalization.[1] Dr. Bruno personally met with Piper later that day and found him to be uncooperative, angry, and in denial about having made any such threats.

{¶ 21} The following day, Dr. Bruno personally spoke with Karen and Steve, who told him of Piper's threats the previous day. Karen, who had been married to Piper for several years, expressed that she was very afraid of Piper and that she feared her life was in danger. Dr. Bruno found Karen and Steve to be reliable. Dr. Bruno's affidavit further states that he opined based upon his own observations, expertise, and review of Piper's records that Piper was "mentally ill and represented a substantial risk of physical harm to himself and others as manifest by evidence of threats to inflict serious bodily harm to his family and himself." Further, Dr. Bruno stated that it was his professional opinion that Piper "represented a substantial risk of physical harm to himself and others. Mr. Piper was in need of emergency treatment in a hospital and would benefit from the treatment." Lastly, Dr. Bruno averred that his decision to continue Piper's hospitalization

> was made in good faith based on current standard of practice and on
> my professional judgment to honestly reach a clinical decision that

---

[1] Piper notes that Schmersal's records of his mental evaluation included two boxes that were checked "No" for whether the patient was homicidal or suicidal. However, the written narrative includes the threats Piper made to his family and about himself and that Piper denied being homicidal or suicidal. Although the checked boxes appear contrary to the written narrative, the end result remained the same, i.e., Piper was hospitalized on an emergency certificate by Schmersal, through Dr. Demosthene. Thus, his risk to himself and/or others was clearly a concern.

would benefit my patient and his family. I was convinced that the best interest of my patient and the safety of his family were primary concerns and ruled out expediency and time constraints.

{¶ 22} Dr. Bruno continued to assess Piper every day during his hospitalization, and on August 30, 2008, he ordered that a psychological evaluation be conducted by Dr. Ferri or Dick Scherger. However, this evaluation was not completed by either of them prior to the time of the hearing. Rather, Dr. Hustak evaluated Piper, but Dr. Bruno was unaware of the results of this evaluation, which was completed on September 1, 2008, until immediately before the hearing on the morning of September 2, 2008. In his deposition, Dr. Bruno testified that he asked for the case to be dismissed once he observed Piper's continuous progress, i.e., that he was no longer angry, he was more cooperative, and he was interacting in a light-hearted manner with the staff, to the point where Dr. Bruno no longer felt that hospitalization was necessary but that Piper could be discharged with proper follow-up.

{¶ 23} Given this evidence, under the *Littleton* and *Loughran* factors, Dr. Bruno presented sufficient facts to make a prima-facie showing that he had acted in good faith. Thus, the burden then shifted to Piper to show that no reasonable psychiatrist would have continued his hospitalization under the circumstances.

{¶ 24} Piper asserts that Dr. Bruno ceased performing his statutory duties as to Piper's mental status less than 24 hours from admission because Piper engaged

the services of an attorney and because Dr. Bruno was angered by Piper's comments that he needed to speak English if he was going to talk to Piper. Piper further maintains that Dr. Bruno did not act in good faith by failing to contact his family about the "safety plan" proposed on August 31, 2008, which involved Piper moving out of the marital home and seeking a dissolution of marriage, and by failing to contact Dr. Hustak about the results of his evaluation, which he knew Dr. Hustak was conducting, and which ultimately concluded that Piper was not mentally ill.

{¶ 25} Although Piper makes a number of assertions about Dr. Bruno's lack of good faith, he presented no evidence to support these assertions. Rather, this claimed lack of good faith is based entirely upon Piper's own opinions and not on the opinion of any psychiatrist that no reasonable psychiatrist would have continued Piper's hospitalization under the circumstances. The only evidence submitted in support of Piper's position is the report and subsequent affidavit of Dr. Hustak, which stated that when he evaluated Piper on August 31 and September 1, 2008, he concluded that Piper was not suffering from any mental illness, that he would not have benefitted from hospitalization, that he was not in need of treatment, and that his activities did not create a grave and imminent risk to the substantial rights of himself or others.

{¶ 26} However, Dr. Hustak is not a psychiatrist; he provided no opinion as to whether Dr. Bruno had failed to act in good faith and, in fact, had rendered no opinions regarding Dr. Bruno's performance, including whether Dr. Bruno should have contacted Piper's family members or Dr. Hustak, himself. In short, Dr. Hustak merely disagreed with Dr. Bruno's assessment of Piper's mental status and need for hospitalization and treatment. This does not rise to the level of demonstrating that no reasonable *psychiatrist* would have committed or released Piper under these circumstances.

{¶ 27} Moreover, noticeably absent from Dr. Hustak's report is any discussion of background information obtained from any of Piper's family. Unlike Dr. Hustak, Dr. Bruno was confronted, as aptly stated by the trial court in its judgment entry, with "the ultimate 'Catch-22,' as he had two ultimate options: (1) admit Plaintiff in involuntary detention or (2) allow him to roam free and carry out the perceived threats." As previously discussed, the good-faith-immunity rule stems from the inherent difficulty of predicting violent behavior, coupled with the degree of variability exhibited by psychiatrists in clinical practice.

{¶ 28} Absent any evidence to show that a genuine issue of material fact existed as to whether Dr. Bruno had acted in good faith in continuing Piper's hospitalization, the trial court committed no error in granting summary judgment in favor of Dr. Bruno. Therefore, the first assignment of error is overruled.

**{¶ 29}** In addition, we find that Piper's second assignment of error regarding the affidavit of Dr. Stephen Noffsinger, which was attached to Dr. Bruno's reply to Piper's opposition to summary judgment, is moot, because neither the trial court nor this court relied on this affidavit in reaching the conclusion that summary judgment was properly granted in favor of Dr. Bruno. Accordingly, the second assignment of error is, likewise, overruled.

**{¶ 30}** For all these reasons, the judgment of the Common Pleas Court of Allen County, Ohio, is affirmed.

Judgment affirmed.

ROGERS, P.J., and WILLAMOWSKI, J., concur**.**