[Cite as *Smith v. Univ. of Cincinnati*, 2012-Ohio-3646.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DEAN SMITH, Admr.

    Plaintiff

    v.

UNIVERSITY OF CINCINNATI

    Defendant

Case No. 2008-11389

Judge Clark B. Weaver Sr.

<u>DECISION</u>

{¶ 1} Plaintiff, Dean Smith, brought this action for wrongful death on behalf of the estate of the his son, Ryan Smith, alleging that Ryan's death on December 27, 2006, occurred as a result of negligent medical treatment rendered by one or more of defendant's employees. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} Dean testified that he and his wife Debra shared their home in Cincinnati with their 23-year old son Ryan, Ryan's girlfriend Erica Welsh, and Ryan and Erica's infant son Jordan. According to Dean, the family exchanged Christmas gifts the morning of December 25, 2006, and had dinner in the late afternoon. Erica, now deceased, testified by deposition that Ryan felt ill throughout the day and complained of a headache. Similarly, Dean recalled that Ryan was not feeling well due to a sinus headache and congestion.

{¶ 3} In the evening, Dean drove Ryan, Erica, and Jordan to Erica's parents' house in Hamilton, Ohio in order for them to celebrate Christmas there, and Dean then

returned to his home.  Erica testified that after her family exchanged gifts, she went to use the restroom, while Ryan went to the kitchen to get a glass of water.  Erica stated that she heard Ryan fall, and that when she came out of the restroom, she saw him lying on the tile floor near the kitchen sink.  According to Erica, Ryan was unconscious and was bleeding from the base of his skull; she added that Ryan had never before fallen or lost consciousness in such a manner.  Paramedics were telephoned at 9:53 p.m., and they transported Ryan to the emergency room (ER) at Fort Hamilton Hospital, arriving there at about 10:15 p.m.

{¶ 4} Steven Purdy, a physician's assistant at Fort Hamilton Hospital, testified by deposition that he performed an initial examination of Ryan and closed a laceration on the back of his head with staples.  A CT scan was also performed and it revealed a skull fracture with bleeding in the subarachnoid space between the brain and the tissue that lines the brain.  As a result of the CT scan and the lack of a neurologist at Fort Hamilton, it was decided that Ryan would be transported to University Hospital in Cincinnati for further evaluation.

{¶ 5} At about 1:30 a.m., Debra received a telephone call from Fort Hamilton Hospital informing her that Ryan had been involved in an accident and was being transferred to the ER at University Hospital.  Dean and Ryan's sister, Anna, drove to University Hospital, arriving there between 1:45 and 2:00 a.m., and were able to see Ryan a few minutes later.  Dean stated that Ryan was lying on a gurney asleep.

{¶ 6} While at University Hospital, Ryan was under the care of the attending physician in the ER that night, Andra Blomkalns, M.D., an employee of defendant.  Ryan was also cared for by Erin Grise, M.D., an emergency medicine resident, and Andrew Losiniecki, M.D., a neurosurgery resident; Drs. Grise and Losiniecki each testified that they were then employed by non-party University Hospital, Inc.

{¶ 7} Dr. Blomkalns testified that she and Dr. Grise performed an initial evaluation of Ryan, and that she monitored him throughout the night in the observation unit.  According to both Drs. Blomkalns and Grise, one of the basic measures used by medical personnel to evaluate head injury patients is the Glasgow Coma Scale (GCS), and they explained Ryan consistently had a GCS score of 14 or 15, which is consistent with a mild, rather than moderate or severe, head injury.  Dr. Blomkalns testified that the

University Hospital ER has a general guideline of providing two CT scans, six hours apart, to patients with minor head injuries, and if the second scan shows stabilization or improvement, the patient may be discharged. Dr. Blomkalns explained that this is a very general rule, that there is no consensus in the field as to how long such patients should be kept for observation, and that the decision to discharge a patient ultimately depends on a physician's discretion.

{¶ 8} After evaluating Ryan, Drs. Blomkalns and Grise developed a treatment plan that entailed having a second CT scan performed about six hours from the time that the first CT scan was performed at Fort Hamilton; if the second scan revealed improvement or stabilization, Ryan could be discharged, but otherwise he would remain for observation. Dr. Losiniecki testified that he performed a neurological evaluation of Ryan at 2:30 a.m. and agreed that a second CT should be ordered in order to determine whether Ryan could be discharged.

{¶ 9} The second CT scan was performed at approximately 4:00 a.m. Drs. Grise and Losiniecki testified that upon reviewing the scan, they believed that the subarachnoid bleeding had diminished in comparison to the first scan such that Ryan appeared stable enough to be discharged from the ER. Dr. Blomkalns stated that she too reviewed the second CT scan and determined that Ryan could be discharged as a result of improvement shown in the second scan, his mental function being at least stable or improving, and her overall observations of him throughout the night; however, she added that Ryan's condition was such that she would not have approved him for discharge if he did not have a caregiver present.

{¶ 10} According to Dean, he was informed around 3:00 a.m. that the second CT scan had been ordered, but he had to leave around that time in order to take Anna back home so that she could go to work. Dean stated that when he returned to the ER around 4:00 a.m., the second CT scan had been performed and he was informed that it showed improvement inasmuch as the bleeding on Ryan's brain was slowing, and that Ryan would soon be discharged. According to Dean, the only instructions he received regarding Ryan's condition and any symptoms to expect or be concerned about were that Ryan might have headaches for the next month, that a follow-up appointment in the neurology department was scheduled for January 10, 2007, and that Ryan was being

prescribed the pain reliever Percocet. According to Dean, the only written information he received was a Discharge Instruction Form that had handwritten directions on the administration of Percocet and a recommendation to either follow up with a primary care provider or the neurology department. (Joint Exhibit A, p. 69.)

{¶ 11} Dr. Grise testified that she gave Ryan verbal instructions about what to expect or symptoms to watch for, but that she was not sure whether Dean was present when this occurred; she stated that her "normal spiel" for head injury patients explained that headaches and nausea might last for 24 hours, that it is acceptable for the patient to sleep so long as he can be woken, and that if the patient cannot be woken or becomes disoriented, he should return to the ER. Dr. Grise stated that her normal practice was to memorialize her oral instructions by writing them on the Discharge Instruction Form, but that she must have been busy and not had time to do so in this instance. Although University Hospital published a one-page instruction sheet for minor head injury patients, neither Dean nor Ryan were given a copy. (Plaintiff's Exhibit 1.) Dr. Grise stated that she did not always provide this instruction sheet to patients inasmuch as she felt it contained poor advice to the extent that it recommended periodically waking patients, and she thus felt that her oral instructions were more accurate. Dr. Blomkalns, who testified that it is preferable to supplement oral instructions with written ones, stated that she too gave some basic oral instructions to Ryan, as well as Dean, such as to come back to the ER if Ryan vomited or if they had any other concerns, but these instructions were not written down either.

{¶ 12} University Hospital records show that Ryan was discharged at 5:49 a.m. Dean stated that when he and Ryan left University Hospital, Ryan was very quiet, and was unsteady to the point that he needed help walking. According to Dean, they stopped at a pharmacy on the way home and had the prescription for Percocet filled. Debra stated that when Ryan arrived home, he seemed groggy, but that she attributed it to the medication. Dean then left for work, but Debra remained home with Ryan through the afternoon. Debra stated that Ryan slept throughout the day, that he walked to the restroom once with her assistance, and that he had no appetite. Debra left for work around 3:30 p.m., but Ryan's adult brother was home at the time, and Dean returned from work around 5:00 p.m.

{¶ 13} Dean stated that when he got home, Ryan complained of a headache, and he gave Ryan a soda and a Percocet as prescribed. According to Dean, Ryan was sleepy all evening, which Dean assumed to be attributable to the medication, but Ryan was nonetheless "fidgety." Dean testified that around 7:00 p.m., Ryan went to the dining room table, spoke with Erica on the telephone, smoked a cigarette, went back to the couch, and fell asleep but remained fidgety. Erica testified that this was the last time she ever spoke with Ryan, and that because he seemed to be "in and out" of their conversation, she told him to go back to sleep. Dean stated that he continued to sit with Ryan until 11:00 p.m., when Debra returned home from work.

{¶ 14} Debra testified that she sat in a chair near Ryan all night to monitor him, and that soon after she got home, she moved him from the couch to the floor because he was writhing such that she feared he would fall off the couch. Debra further testified that she heard Ryan make a gurgling noise in his sleep, but she thought it might be attributable to his pre-existing sinus infection, and she did not want to be "paranoid." However, Debra awoke around 4:30 a.m. to discover that Ryan was struggling to breathe. Debra immediately woke Dean, and they dialed 911. An ambulance quickly arrived and transported Ryan to Mercy-Mt. Airy Hospital, and Dean and Debra traveled there by car. Doctors in the ER attended to Ryan, but he ultimately died at about 6:00 a.m. Following an autopsy, the Hamilton County Coroner determined the cause of death to be "meningitis due to skull fracture due to blunt impact to the head." (Joint Exhibit A, p. 103.)

{¶ 15} Plaintiff alleges that defendant was negligent in failing to properly evaluate and treat Ryan, and that his death resulted therefrom. Specifically, plaintiff alleges that Ryan was inappropriately discharged from the ER, that the instructions provided at the time of discharge were inadequate, and that Ryan was inappropriately prescribed Percocet. Defendant contends that Ryan's care and treatment at all times met the applicable standard of care.

{¶ 16} "In order to establish medical [negligence], it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by

the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131 (1976).

{¶ 17} "To maintain a wrongful death action on a theory of medical negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92 (1988), citing *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122, paragraph one of the syllabus (1966).

{¶ 18} Plaintiff presented the expert testimony of Samuel J. Kiehl, III, who is an ER physician at the Ohio State University Medical Center, and formerly served as the chief ER physician at Riverside Methodist Hospital in Columbus. Dr. Kiehl testified that the GCS is a very basic measure by which medical professionals assess head injuries, and that while Ryan's GCS scores of 14 or 15 were consistent with a mild head injury, there were several factors that nonetheless placed Ryan at a high risk for developing more serious conditions such as a blood clot in the brain or cerebral edema, swelling of the brain. According to Dr. Kiehl, Ryan's risk factors included the skull fracture, subarachnoid bleeding, and swelling revealed by the CT scan performed at Fort Hamilton, as well as Ryan's inability to explain why or how he fell.

{¶ 19} Dr. Kiehl opined that a patient with symptoms such as those revealed in the first CT scan should be kept in the ER for observation for a period of between 12 and 24 hours after the injury occurred, depending on the circumstances, to ensure that neurological function returns and that complications such as cerebral edema do not develop, and that a second CT scan may be appropriate at the end of that observation period to rule out any complications. Dr. Kiehl thus opined that it was inappropriate to discharge Ryan some eight hours after his accident, and he further stated that regardless of how long Ryan had been under observation, the decision to discharge him fell below the standard of care because he was not sufficiently awake and alert to be properly evaluated.

{¶ 20} Dr. Kiehl explained that the autopsy results revealed progressive cerebral edema, and that in the final stages of this process, the brain was caused to herniate, or expand outside its normal position, which is nearly always fatal. Regarding the symptoms associated with the process, Dr. Kiehl testified that cerebral edema reduces the flow of blood to the brain, thereby causing an increase in blood pressure as the body attempts to deliver more. Dr. Kiehl added that while headaches and sleepiness are normal in the immediate aftermath of a head injury, the unsteadiness, drowsiness, and fidgeting that Ryan's parents described are symptomatic of cerebral edema. Dr. Kiehl opined that if Ryan had been kept in the ER for the length of time required by the standard of care, changes in blood pressure and other vital signs that would have accompanied the developing cerebral edema, as well as the outward symptoms such as those noted by Dean and Debra, more likely than not would have been discovered and led to an appropriate neurological diagnosis and treatment.

{¶ 21} Dr. Kiehl also opined that the instructions provided to Dean and Ryan at the time of discharge fell below the standard of care, which he described as requiring detailed instructions, both orally and in writing, telling the caregiver what symptoms to expect and what symptoms require further medical attention. He explained that oral instructions are often forgotten or misunderstood, and thus must be memorialized in writing.

{¶ 22} Finally, Dr. Kiehl stated that prescribing Percocet was not within the standard of care because it is a relatively potent narcotic that could have masked Ryan's symptoms by causing drowsiness and thereby obscuring his consciousness. In Dr. Kiehl's opinion, Tylenol or Toradol would have been appropriate pain relievers.

{¶ 23} Plaintiff presented expert testimony on the issue of causation from George Riley Nichols, II, a board-certified anatomic, clinical, and forensic pathologist who served for 20 years as the Chief Medical Examiner for the Commonwealth of Kentucky. Dr. Nichols testified that Ryan's autopsy revealed a fracture on the back of the skull and contamination of the material lining the brain, which resulted in a meningitis infection. According to Dr. Nichols, Ryan's cerebral edema was a progressive process caused both by the meningitis and the trauma to the brain. Dr. Nichols stated that the pathology of that process would have produced a predictable set of progressive symptoms which,

if not interrupted, would lead to death. He explained that the swelling would have resulted in headache, confusion, lethargy, somnolence, difficulty ambulating, seizure activity, and, in the final stages, passing out or going comatose. According to Dr. Nichols, the swelling process ultimately results in herniation of the brain, whereby the brain protrudes outside the space in which it is normally contained, and he related that the autopsy results show that Ryan's brain indeed herniated through the base of the skull. Dr. Nichols related that once the herniation occurs, respiratory and circulatory functions are diminished, and within minutes cardiac arrest occurs.

{¶ 24} Dr. Nichols testified that there are various treatment methods used to halt the swelling process, including medication, fluid restrictions, and surgical removal of cerebral spinal fluid or a portion of the cranium. Dr. Nichols opined that the pathology of Ryan's cerebral edema was such that the condition was treatable and that Ryan should have survived if he had received the appropriate treatment.

{¶ 25} Lastly, Dr. Nichols also testified that while Ryan was found to have had cocaine metabolite in his blood system, the parent drug was not present. Dr. Nichols opined that although cocaine can cause sudden death, this nearly always occurs while the parent drug is present.

{¶ 26} Defendant presented expert testimony from Charles A. Eckerline, Jr., who is an associate professor and physician at the University of Kentucky Medical Center emergency medicine department, and is board-certified in emergency medicine. Dr. Eckerline testified that the standard of care for treating head injury patients in an ER is for the ER physician to make a total assessment of the patient, then evaluate the head injury, perform a CT scan or other diagnostic test if necessary, and consult with a neurosurgeon if necessary to discuss test results or the appropriateness of admitting or discharging the patient. Dr. Eckerline testified that there are a variety of guidelines for determining how long a head injury patient should be kept for observation, and that a physician's clinical judgment is the most important factor. As for patients who are administered a CT scan upon their arrival to the ER, Dr. Eckerline opined that these patients are generally kept for observation for a period of four to twelve hours, and then another CT scan is administered.

{¶ 27} Dr. Eckerline testified that in Ryan's case, the treating physicians at University Hospital decided to observe him until six hours had passed since his first CT scan at Fort Hamilton Hospital, and to then administer a second CT scan. Dr. Eckerline opined that because Ryan was stable and neurologically intact during the observation period, and inasmuch as the second CT scan showed that the subarachnoid bleeding had slowed and revealed no increased brain swelling, the decision to discharge him to a caregiver, Dean, complied with the standard of care.

{¶ 28} Regarding discharge instructions for patients with head injuries such as Ryan's, Dr. Eckerline testified that the standard of care requires that both the patient and caregiver be informed of the diagnosis, expected symptoms, and symptoms that would require a return to the ER. Specifically, Dr. Eckerline testified that these instructions should note that the patient is expected to be drowsy and have a headache, but that if these conditions worsen or do not improve over time, or if the patient experiences difficulty walking, changes in mental status, difficulty being aroused, slurred speech, or nausea, then the patient should come back to the ER; further, such patients should be advised to follow up with their primary care providers. Dr. Eckerline opined that written instructions are recommended in order to supplement and document oral instructions, but that oral instructions are more important and comply with the standard of care.

{¶ 29} Concerning medication, Dr. Eckerline opined that prescribing Percocet for Ryan's severe headache was within the standard of care. According to Dr. Eckerline, Tylenol would not have been potent enough to relieve the headache pain, and Toradol would have thinned the blood and increased the risk of subarachnoid bleeding.

{¶ 30} Defendant also offered expert testimony from Patrick McCormick, a board-certified neurological surgeon practicing in Toledo, Ohio. Dr. McCormick testified that the standard of care for treating head injury patients is to interview the patient and perform an overall examination, then examine for the effects of the head injury, which may include assessing a GCS score and performing a CT scan, and then develop a treatment plan. According to Dr. McCormick, there are many different algorithms used by medical professionals to determine the appropriate course of treatment, but a physician's professional judgment is the most important determiner.

{¶ 31} Dr. McCormick stated that a patient with a mild head injury and no risk factors can be discharged immediately or with minimal observation, but he related that Ryan presented some risk factors, including the subarachnoid hemorrhage and skull fracture, which required a longer period of observation. In Dr. McCormick's opinion, an observation period of six hours was appropriate under the circumstances, and it was within the standard of care to discharge Ryan after that time inasmuch as he had at least remained stable and the second CT scan showed improvement. Dr. McCormick further opined that the sequela leading to Ryan's death was highly unusual and that keeping Ryan hospitalized would not have prevented his death. As to the pain medication prescribed for Ryan, Dr. McCormick testified that Percocet was appropriate for a patient with Ryan's injuries.

{¶ 32} Upon review of the evidenced adduced at trial, the court finds that the care and treatment Ryan received in the ER at University Hospital fell below the standard of care. Although defendant's experts opined that the duration of Ryan's observation complied with the standard of care, and that Ryan's sequela was unusual, the court is persuaded by Dr. Kiehl's testimony that the standard of care requires that a patient with Ryan's symptoms be kept for observation until, at the very minimum, 12 hours have passed since the injury occurred, particularly because cerebral edema is a known complication, and one that takes several hours to manifest. The court is further persuaded by Dr. Kiehl's testimony that, no matter the duration of the observation, it was inappropriate to discharge Ryan inasmuch as he was not sufficiently awake and alert to be properly evaluated. Indeed, Dean credibly testified that at the time he was discharged, Ryan was sleepy, abnormally quiet, and needed assistance simply to walk.

{¶ 33} Both Dr. Kiehl and Dr. Nichols described a series of progressive symptoms that accompany cerebral edema such as that from which Ryan suffered. Dr. Kiehl testified that these symptoms, such as heightened blood pressure, somnolence, unsteadiness, and seizure-type activity, would have manifested during an appropriate period of observation, been recognized by the medical professionals observing Ryan and monitoring his vital signs, and led to him receiving appropriate neurological evaluation, diagnosis, and treatment. Dr. Nichols explained the pathology of Ryan's cerebral edema and testified to the existence of a range of treatments available

depending on the nature and severity of the condition, and he opined that if Ryan had received such treatment, he should have survived. While Dr. McCormick opined that the progression of Ryan's cerebral edema was such that he would not have survived even if he had remained hospitalized, the court finds his opinion lacking in detail and less persuasive than the expert testimony offered by plaintiff.

{¶ 34} The court finds that plaintiff has established that if Ryan had remained under observation in the ER for the period of time required by the standard of care, it is more probable than not that he would have survived. Moreover, the court finds that this failure to comply with the standard of care was the sole proximate cause of his outcome. In light of this finding, the court need not determine whether the discharge instructions or prescription for Percocet complied with the standard of care.

{¶ 35} Lastly, defendant asserts that a percentage of liability must be apportioned to non-party University Hospital, Inc., which employed the residents involved in Ryan's care and treatment. However, defendant's employee, Dr. Blomkalns, testified that she was responsible for the supervision and education of such residents at all times relevant, and that she provided care and treatment to Ryan herself. Dr. Blomkalns stated that she arranged for Ryan's transfer from Fort Hamilton Hospital, that upon Ryan's arrival in the ER she and Dr. Grise evaluated him and planned his course of treatment, she saw Ryan throughout his observation period, reviewed the results of the second CT scan in conjunction with Drs. Grise and Losiniecki, approved of Ryan being discharged, and saw Ryan at the time of discharge, at which time she provided some basic oral instructions to Dean and Ryan. Based upon both the care and treatment that Dr. Blomkalns rendered, which included developing a course of treatment that failed to meet the standard of care, as well as her teaching and supervisory responsibilities toward residents, the court finds that liability is attributable solely to defendant.

{¶ 36} Based on the foregoing, the court finds that plaintiff has proven his claim of medical negligence by a preponderance of the evidence and judgment shall be entered accordingly.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DEAN SMITH, Admr.

    Plaintiff

    v.

UNIVERSITY OF CINCINNATI

    Defendant

Case No. 2008-11389

Judge Clark B. Weaver Sr.

JUDGMENT ENTRY

{¶ 37} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff. The case will be set for trial on the issue of damages.

_____
CLARK B. WEAVER SR.
Judge

cc:

Brian M. Kneafsey, Jr.
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Donna L. Crossley
2350 Chiquita Center
250 East Fifth Street
Cincinnati, Ohio 45202

Joseph W. Shea III
Shirley A. Coffey
119 West Central Parkway
300 Court Index Building
Cincinnati, Ohio 45202

001

Filed February 21, 2012
To S.C. Reporter August 13, 2012