[Cite as *Miller v. Ohio Dept. of Transp.*, 2012-Ohio-6323.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DENNIS D. MILLER, Admr., etc.

    Plaintiff

    v.

OHIO DEPARTMENT OF TRANSPORTATION, et al.

    Defendants

Case No. 2009-07679

Judge Alan C. Travis
Magistrate Holly True Shaver

DECISION OF THE MAGISTRATE

{¶ 1} Plaintiff brought this action against the Ohio Department of Transportation (ODOT) alleging claims of negligence and wrongful death on behalf of himself and the heirs of decedent, Pauline Miller.[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.[2]

{¶ 2} This case arises out of a motor vehicle collision that occurred on March 11, 2008, on State Route (SR) 165 in Columbiana County, Ohio.[3] SR 165 is a rural, two-lane highway near the border of Columbiana and Mahoning Counties. At approximately 7:18 a.m., plaintiff's decedent, Pauline Miller, was driving her 1994 Dodge Intrepid northbound on SR 165. At the same time, Joseph Goscenski, Jr., a truck driver employed by George Wm. Morgan, Jr. & Co., was driving a 1999 International 4900 straight truck southbound on SR 165. In the area near the 1.0 to 1.3 mile marker, the

---

[1]Although plaintiff named both ODOT and the State of Ohio as defendants, the term "defendant" shall be used to refer to ODOT throughout this decision.

[2]This case was tried to the court simultaneously with Case No. 2009-09205.

[3]All dates in March refer to the year 2008.

southbound lane of SR 165 ascends a small hill.  Beyond the hill, a series of large potholes existed in the southbound lane.  Goscenski asserts that the wheels of his truck struck the potholes, which caused him to lose control of his truck.  Goscenski's truck crossed the center line and struck Miller's vehicle, killing her.

{¶ 3} Plaintiff asserts that defendant was negligent in failing to repair the potholes prior to the collision, and that defendant's failure was the proximate cause of Miller's death.  Defendant denies that the truck struck the potholes.  However, defendant contends that even if the truck did strike the potholes, defendant did not have notice of the particular defects in the roadway and is, therefore, not liable for plaintiff's injuries.

{¶ 4} Dennis Miller testified that he and Pauline Miller had been married for 24 years at the time of the accident, and that they had two children, Nathan and Rachel.

{¶ 5} Joseph Goscenski, Jr. testified that he was employed by Morgan Trucking which is based in Freedom, Pennsylvania, near Pittsburgh.  On March 11, 2008, he was scheduled to deliver bulk mail in Cleveland by 5:00 a.m.  Therefore, he began his work day at 1:00 a.m, which was earlier than his usual start time.  The truck he was driving was known as a "straight truck," comprised of a cab and a chassis with a 26-foot long box trailer.  The truck was equipped with single tires on the front end and "dual" tires on each side of the rear of the trailer.

{¶ 6} Prior to beginning his trip, Goscenski performed a pre-trip inspection of the truck,  which included checking the brakes, pulling on the slack adjusters, making sure the warning buzzers were working, and inspecting the tires.  Goscenski found no problems with the truck and began his route.

{¶ 7} Goscenski completed his last delivery in Cleveland at approximately 4:30 or 4:45 a.m., and then headed back to Pittsburgh.  Goscenski decided to take a faster route on the return trip to arrive timely for an eye doctor's appointment scheduled for 8:30 a.m.  At some point on the way back to Pittsburgh, Goscenski was traveling on SR 165 southbound.  The speed limit where the collision occurred was 55 miles per hour

(mph). Goscenski estimated his speed at approximately 50 mph as he crested the hill. Goscenski testified that as he started down the hill he heard a big "bang" and his truck went left of center. Goscenski tried to steer his truck back into the southbound lane with no success. Goscenski saw Miller's vehicle coming directly at him and braced himself. Goscenski's truck struck Miller's vehicle, then went off the roadway, over snow-covered grass, and came to rest in a field.

{¶ 8} Goscenski testified that he did not see the potholes until his truck struck them, and that the potholes were on the right side of his travel lane. Goscenski added that when his truck struck the potholes, he thought that one of his tires had "blown out" due to the sudden, unexpected force that made him lose control of his vehicle. Goscenski testified adamantly that his vehicle came into contact with the potholes and that the impact caused him to lose control of his vehicle. While Goscenski admitted that he had been in a hurry to return to Pittsburgh for his doctor's appointment, he stated that he had enough time to travel without being careless in the operation of his truck.

{¶ 9} Ohio State Highway Patrol (OSHP) Trooper Timothy Jones (now retired) testified that he was dispatched to the accident scene to conduct an investigation. Trooper Jones testified that he interviewed Goscenski and that he took measurements of the vehicles' final resting points and of the potholes. The measurements taken at the scene show that the first series of potholes measured 17.79 feet in length and the second series of potholes measured 10.67 feet in length. Both series of potholes were located on the right side of the southbound lane of travel. (Joint Exhibit 14.) Trooper Jones noted the following in his narrative report: "Pavement in poor condition due to large pot holes at the scene. Large pot hole measured and found to be 5 inches in depth with a width of 24 inches into the southbound lane. The south end was not gradual but abrupt and near straight down." (Joint Exhibit 1.) Trooper Jones explained that instead of being a gradual incline or decline, the pothole was "basically like hitting a curb, straight down." Trooper Jones testified that he called Barry Miner, ODOT's local superintendent, and that he closed the road until the potholes were repaired.

{¶ 10} John Rieseck testified via deposition that on the morning of the collision, he was driving to Youngstown for classes at ITT Technical Institute; that he saw the ambulance and both disabled vehicles; and that he continued on to school. Rieseck explained that he had struck the same set of potholes approximately 2 to 3 weeks prior to the accident on his way home from school, that he felt that the potholes were "pretty bad," and that he called ODOT to report them. Rieseck does not recall the date that he called ODOT, but stated that it was shortly after he had struck the potholes. Rieseck testified that he spoke to someone at ODOT, told the individual that he wanted to report a bad road condition, and that he reported the approximate area of the potholes. When shown photos of the potholes taken on the date of the accident, Rieseck stated that the potholes he had reported were in the same location on SR 165, but that the potholes depicted in the photographs had increased in depth, width, and length. Rieseck also disclosed that he is a friend of Nathan Miller, plaintiff's decedent's son.

{¶ 11} Becky Giauque testified that at the time of the accident she was employed by ODOT as a public information officer in District 11. Giauque stated that the public is encouraged to report the existence of potholes to ODOT by phone, e-mail, or by filling out a "feedback form" on ODOT's website. With regard to phone calls, Giauque testified that anyone who answers the phones at ODOT can take a complaint, but that there is no particular person assigned solely to handle complaints from the public. Giauque also stated that ODOT has a computer database known as the Customer Inquiry Management System, whereby complaints from the public can be documented. However, Giauque stated that there is no policy for how complaints are to be logged into the system.

{¶ 12} Sandra Rafferty testified that she was employed as a dispatcher for the OSHP at the time of the accident; that the patrol maintains a daily patrol phone and radio log; and that she was working at the Lisbon post at the time of the accident. Rafferty testified that when she receives a call from the public regarding a roadway

hazard, such as a pothole on a State Route, she determines the location of the pothole and then calls ODOT's general phone number to report it. Rafferty stated that there is no requirement to document a call from the public, and that in her experience, not every call or complaint from the public gets recorded in the logs.

{¶ 13} Barry Miner testified that he had worked for ODOT for over 29 years and that he was a county manager for Columbiana County at the time of the accident. Miner testified that one of his main job duties was inspecting the roadways and that he spent approximately three to four hours per day driving the roadways in the county looking for roadway hazards. Miner testified that he kept a daily log of his work activities on his calendar. (Joint Exhibit 23.) On Thursday, March 6, 2008, Miner wrote "run 165," which he explained meant that he had inspected SR 165 for roadway hazards. Miner stated that SR 165 in Columbiana County is a short section of the roadway, fewer than three miles long. Miner observed that more than one pothole did exist on SR 165 on March 6, 2008, but determined that none of those potholes warranted immediate repair. Miner estimated that the potholes on SR 165 on March 6 were "first layer" potholes, approximately 2 inches deep, 12 inches long and 8 inches wide and that they could have been repaired with a "shovel full" of patching material. Miner did not document the exact location of the potholes on SR 165, but stated that it was his intention to have those potholes patched. Miner agreed that he did not send a crew to repair any potholes on SR 165 from March 6 until March 11.

{¶ 14} Miner agreed that the potholes that existed on the day of the accident were large and deep, and that they needed to be filled. Miner estimated that the size of the potholes from Thursday, March 6 to Tuesday, March 11 had increased by ten times. Miner agreed that SR 165 had been designated as a poor-performing road prior to the accident, and that it had been scheduled to be repaved, but noted that the repaving schedule was "about 2 years out."

{¶ 15} Miner explained that the Friday before the accident, the area had been hit by a storm of more than eight inches of snow, and that his crews were working around

the clock in snow and ice removal on March 7, 8, and 9. Although he was on vacation on March 10, the work orders show that both snow and ice removal and pothole patching were taking place in the county that day. Miner stated that snow and ice removal for that particular weekend would have taken precedence over pothole patching.

{¶ 16} Gary Rhodes testified that in 2008, he was a transportation manager for ODOT in Columbiana County, that his duties included roadway maintenance, and that his supervisor at the time was Barry Miner. Rhodes stated that if a pothole is over two inches deep, it must be filled, and that one of his job responsibilities is to identify potholes and repair those that are hazardous to the traveling public.

{¶ 17} Harold Lipp testified that he has lived at the corner of Heck Road and SR 165 since 1954, and that he owns the land that is adjacent to the location on SR 165 where the accident took place. Lipp testified that potholes were present on SR 165 for weeks prior to the accident and that the size and severity of the potholes increased over time. Lipp also stated that he got into the habit of driving down the center of the road after making sure no opposing traffic was coming so that he could avoid the potholes. However, Lipp also stated that he never contacted ODOT, the sheriff, or any other governmental agency to report the potholes prior to the accident.

{¶ 18} Lipp testified that when he drove to church on Sunday, March 9, 2008, there was snow on SR 165 and that the roadway had not been plowed. When he returned home from church, he noticed that the road had been plowed, and he surmised that the "state truck" had hit the potholes because he observed that a snow plow blade had made an imprint in the snow bank adjacent to the potholes. Lipp recalled that he thought at the time that since the state truck had hit the potholes, they would soon be patched. Lipp added that he assumed that the plow print had been made by an ODOT vehicle because he had observed ODOT snow plows clearing snow from SR 165 in the past. Lipp also stated that on the day of the accident, he drove his tractor over his

property to the accident scene so that he could see what had happened. However, he admitted that he remained approximately 25 yards away from the potholes at that time.

{¶ 19} Plaintiff presented the expert testimony of Joseph Filipino, who stated that he had worked for the Pennsylvania Department of Transportation (Penn DOT) for more than 30 years during which time he oversaw eight counties in connection with maintenance and road repair. Filipino testified that he developed a preventative maintenance plan regarding potholes for Penn DOT. Filipino opined that if the potholes depicted in the photographs were in that same condition three weeks prior to the accident, they should have been immediately repaired. On cross-examination, Filipino admitted that this was the first time that he had testified as an expert on potholes.

{¶ 20} Plaintiff's second expert, Henry Lipian, testified that he was employed by OSHP for eight years and is currently employed as an accident reconstructionist for Introtech, Inc. Lipian inspected and took photographs of the truck on October 15, 2010. Lipian also reviewed the photographs taken on the day of the accident; however, he was not able to inspect the decedent's vehicle as it was not available. Lipian visited the location of the accident, took photographs, and prepared a scale diagram of the accident scene. Lipian testified that until the truck crested the hill, there was no opportunity for the driver to perceive either oncoming traffic or any imperfections in the road surface. Lipian also testified that the potholes were located on the right side of the southbound lane, which presented a high probability of the truck coming into contact with the potholes because of the wide wheel track of a truck. Lipian stated that in order to calculate the speed of a vehicle before impact, one must calculate the speed of a vehicle after impact. However, Lipian stated that the lack of tire marks on the roadway and the fact that the truck drove over rough, snow-covered terrain resulted in a lack of evidence from which to calculate a specific speed for either vehicle.

{¶ 21} Lipian concluded that the truck had struck the potholes based upon his examination of the photos taken after the accident which depict an imprint of a tire in the bottom of the pothole. Lipian stated that the tread pattern of the imprint is consistent

with the tread pattern on the right front tire of the truck that he inspected.  Lipian also stated that the right front truck tire sustained damage that he described as an unusual kind of distress pattern of irregular fissures, cracks and gouge marks, consistent with hitting the jagged, deep edge of the pothole.

{¶ 22} Furthermore, Lipian opined that the truck made contact with the decedent's vehicle at an angle, and that the truck did not gradually drift over into the opposite lane of traffic.  In support of his opinion, Lipian noted that the truck came to rest in a field after traveling in a diagonal direction from impact.  Lipian stated that if the truck had traveled in the opposite lane of traffic and struck the decedent's vehicle head-on, he would have expected the truck to stay in that lane and push the decedent's vehicle backwards.  Lipian also questioned whether Goscenski was wearing his seat belt as he had reported to OSHP based upon the damage to the steering wheel.

{¶ 23} Defendant's expert, Timothy Tuttle, testified that since 2001, he has worked in the private sector as an accident reconstructionist after having retired from OSHP.  Tuttle explained that he inspected the truck, that he reviewed the OSHP traffic crash report, the measurements taken by OSHP, the photographs, and that he visited the scene of the accident.  Tuttle stated that after he examined the damage to both vehicles, he found that it was a "classic head-on collision."  Tuttle opined that the truck was in the northbound lane when it collided with the car, and that the truck did not strike the potholes.  Tuttle stated that the impact of the vehicles occurred entirely within the northbound lane, and that the damage was inconsistent with the truck being in the southbound lane, striking the potholes and then swerving or turning into the northbound lane.  Tuttle stated that in his review of the evidence, there was no angle of impact; that the vehicles were in line with each other.  Tuttle disagreed with Lipian's interpretation of how the crash occurred.  Tuttle stated that if the crash had occurred in the manner in which Lipian testified, the damage to the front of the truck would have a wedge shape or an angle shape.  Tuttle also explained that in his opinion, if the accident were to have

occurred the way Lipian opined, the swerving of the truck and the lateral friction that would have been generated by the tires would have been very high, and it should have left a scuff or a tire mark on the roadway, which is referred to as a "yaw mark." Tuttle noted that the photos of the accident scene show no yaw marks. Tuttle also stated that if the truck had traveled at a speed of 50 miles per hour and impacted the vehicle at an angle, the truck would have rolled over.

{¶ 24} Tuttle related that he saw no evidence of damage to the truck that would show that it had hit a pothole, and that the imprint of the tire in the pothole was "completely different" from the truck tire imprint. Tuttle stated he was able to calculate the speed of the truck by using the concept of conservation of momentum, and he opined that the truck was traveling at 64 mph.

{¶ 25} Upon review of the expert testimony of Lipian and Tuttle, the court finds that the testimony of Lipian was more persuasive than that of Tuttle. The court finds that Goscenski's testimony that his truck struck the potholes which caused him to lose control of his truck was credible. The court further finds that Lipian's testimony of the manner in which the accident happened was more credible than Tuttle's version of events. Accordingly, the court finds that Goscenski's truck did strike the potholes.

{¶ 26} The issue then becomes whether plaintiff has proven that defendant committed a breach of the duty owed to plaintiff's decedent. "To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92 (1988), citing *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122 (1966).

{¶ 27} Defendant has a general duty to maintain its highways in a reasonably safe condition for the traveling public. *Knickel v. Ohio Dept. of Transp.*, 49 Ohio App.2d 335 (10th Dist.1976). However, defendant is not an insurer of the safety of its highways. See *Rhodus v. Ohio Dept. of Transp.*, 67 Ohio App.3d 723 (10th Dist.1990).

{¶ 28} It is well-settled that ODOT may be subject to liability for its failure to exercise reasonable care in maintaining state highways. *White v. Ohio Dept. of Transp.*, 56 Ohio St.3d 39, 42 (1990). However, ODOT is not liable for damages caused by dangerous conditions on state highways unless it has actual or constructive notice of the precise condition alleged to have caused the injuries in question. *Manning v. Ohio Dept. of Transp.*, 10th Dist. Nos. 96API07-931, 96API07-932, 96API07-937 (April 24, 1997), citing *McClellan v. Ohio Dept. of Transp.*, 34 Ohio App.3d 247, 249 (10th Dist.1986). "In order for there to be constructive notice of a nuisance or defect in the highway, it must have existed for such length of time as to impute knowledge or notice." *Id.* at 250. The state cannot be charged with neglect unless it is demonstrated that the state had knowledge, either constructive or actual, of the roadway defect complained of, and within sufficient time to remedy it. *Danko v. Ohio Dept. of Transp.*, Ct. of Cl. No. 90-05881 (July 29, 1992), *aff'd*, 10th Dist. No. 92AP-1183 (Feb. 4, 1993); *see also Ruwe v. Bd. of Commrs. of Hamilton Cty.*, 21 Ohio St.3d 80 (1986); *In re Estate of Fahle*, 90 Ohio App. 195 (6th Dist.1950). ODOT must be given a reasonable amount of time to mobilize its resources for the repair of highway defects and also to prioritize among competing repair needs of the state's highways. *Danko*, *supra,* at 3. Size of a defect in the roadway is insufficient to show notice or duration of existence. *O'Neil v. Ohio Dept. of Transp.,* 61 Ohio Misc.2d 287 (Ct. of Cl.1988).

{¶ 29} Defendant's second expert, David Ray, testified that he is the state maintenance engineer for ODOT, that he works in the central office in Columbus, and that his duties include setting the policy for maintenance of state roadways. Ray explained that there are two different inspection methods that ODOT uses. State-wide inspections are conducted by inspectors who review all 43,000 lane miles of Ohio's state roadways on an annual basis to identify pavement deficiencies. Ray described the state inspections as a long-range planning tool. The second inspection method is informal and is made by the county level managers on a daily basis.

{¶ 30} Ray testified that various factors are involved in the formation of potholes such as soil conditions, pavement types, compaction of the pavement, freeze/thaw conditions, and traffic frequency. Ray added that weather affects potholes, especially during freeze/thaw cycles. Ray noted after reviewing the work records for Columbiana County, that in the seven days prior to the accident, the county performed both snow and ice removal and  pothole patching.

{¶ 31} Ray stated that although there is no requirement to document incoming calls from the motoring public, if a motorist were to report a pothole, it would be acted upon and any such call would be taken seriously. Ray testified that he helped develop a maintenance operations overview, wherein all ODOT employees were taught that when they see a pothole or other deficiency they should let a manager know about it. Ray testified that he would expect any ODOT employee who observed potholes such as the ones depicted in the photos from the accident to report them immediately.

{¶ 32} Ray admitted that in his review of the work records, no potholes were patched on SR 165 in the 30 days prior to the accident, and that the last patching recorded of SR 165 was on January 18, 2008. Ray also noted that ODOT had no record of any call made by Rieseck or anyone else who had reported potholes on SR 165 prior to the accident.

{¶ 33} Ray testified that in winter operations, ODOT prioritizes routes for snow and ice removal. Ray agreed that during the winter, snow and ice removal is performed prior to pothole patching. However, if he encountered potholes such as the ones depicted in the accident scene photographs, he testified that he would order them to be immediately repaired.

{¶ 34} Upon review of the testimony and evidence presented at trial, the court finds the following. Barry Miner testified that he inspected SR 165 on March 6 and that he observed potholes on the roadway but that in his opinion, they did not need immediate repair at that time. However, Miner also testified that it was his intention to repair those potholes eventually. There is no documentation in evidence to show that

Miner scheduled any potholes for repair on SR 165 between March 6 and March 11. Defendant's records show that the last time that pothole patching occurred on SR 165 prior to the accident was on January 18. Both Rieseck and Lipp agreed that the condition of the potholes deteriorated over time. Rieseck testified that the potholes depicted in the photographs appeared larger, wider, and deeper than the potholes appeared when he reported them. All witnesses agreed that the potholes in existence on March 11 constituted a hazard.

{¶ 35} The court finds that ODOT had actual notice that potholes existed on SR 165 on March 6, 2008. However, the court further finds that the potholes on March 6 were not of the same magnitude as the potholes on March 11. Therefore, the court finds that ODOT did not have actual notice of the precise condition of the roadway defect that was present on March 11.

{¶ 36} On March 7, a snowstorm hit the area. Although ODOT has no record of inspecting SR 165 for potholes after March 6, it is undisputed that ODOT was responsible for plowing snow in the area where the accident occurred. Defendant's records establish that snow and ice removal was taking place in the county on March 6-10. It is also undisputed that ODOT was patching potholes on other roadways in the county on March 6, 7, and 10. The court finds that ODOT had the responsibility to plow snow from SR 165, that it was aware that potholes existed in the area on March 6, and that both snow removal and pothole patching were taking place at that time. The greater weight of the evidence shows that sufficient time passed from March 6 to March 11 for ODOT to have learned that the potholes that had existed on SR 165 on March 6 were deteriorating and were becoming a hazard to the motoring public. Although Ray testified that potholes are unpredictable, it is foreseeable that a pothole that is left unrepaired, especially during the winter months, can grow into the hazard that existed on March 11. The court finds that plaintiff has established, through the testimony of

Rieseck, Lipp, and Miner, that the potholes that existed on March 6 were the same potholes that existed on March 11 from mile marker 1.0 to 1.3 on SR 165.

{¶ 37} Lipp testified that on Sunday, March 9 when he returned home from church, he saw evidence that a snowplow had struck the potholes and had left an imprint in the snow bank near the side of the road. Although defendant argues that there is no evidence that an ODOT snow plow had made an imprint in the snow, it is undisputed that ODOT was responsible for snow and ice removal in that area of SR 165. Lipp testified that when he drove to church on March 9, SR 165 had not been plowed but when he returned home, it had been plowed. The court finds that ODOT cleared the snow on March 9 and traveled over SR 165 where the potholes were. The court finds that it is more likely than not that the potholes had deteriorated from March 6 to March 9, especially in light of the testimony of Ray, who stated that weather during the freeze/thaw period affects pothole formation. Upon review of the evidence presented, the court finds that plaintiff has proven by a preponderance of the evidence, that by March 9, ODOT had constructive notice that the potholes on SR 165 were unreasonably dangerous to the traveling public and in need of immediate repair. ODOT's subsequent failure to repair the potholes before March 11 was a breach of its duty owed to plaintiff's decedent and to the traveling public. The court further finds that defendant's failure to repair the potholes on SR 165 from mile marker 1.0 to 1.3 was the sole proximate cause of plaintiff's injuries. Goscenski testified credibly that after his truck struck the potholes, he was unable to control his truck and crossed the center line, striking plaintiff's decedent's vehicle. The court finds that but for the existence of the potholes, the motor vehicle collision would not have occurred.

{¶ 38} Defendant requests that the court apportion the percentage of fault attributable to Goscenski pursuant to R.C. 2307.22. However, based upon the court's finding that ODOT's negligence was the sole proximate cause of the collision, R.C. 2307.22 is not applicable.

{¶ 39} For the foregoing reasons, the court finds that plaintiff has proven his claims of negligence and wrongful death by a preponderance of the evidence, and, accordingly, judgment is recommended in favor of plaintiff.

{¶ 40} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

cc:

| | |
|---|---|
| Ellen M. McCarthy | Emily M. Simmons |
| Jamie R. Lebovitz | William C. Becker |
| 1370 Ontario Street, Suite 100 | Assistant Attorneys General |
| Cleveland, Ohio 44113-1792 | 150 East Gay Street, 18th Floor |
| | Columbus, Ohio 43215-3130 |

002
Filed March 19, 2012
To S.C. Reporter January 16, 2013