[Cite as *Polkow v. Youngstown Dev. Ctr.*, 2012-Ohio-6347.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ROGER POLKOW, Exec., etc.

    Plaintiff

    v.

YOUNGSTOWN DEVELOPMENT CENTER

    Defendant

Case No. 2011-01291

Judge Clark B. Weaver Sr.

DECISION

{¶ 1} Plaintiff, Roger Polkow, executor of the estate of his son, Dale Polkow, brought this action alleging claims of wrongful death and survivorship.[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} Dale was born with mental retardation and was eventually diagnosed with bipolar disorder. Dale lived with his parents until he was 40 years old. Thereafter, Dale resided at various treatment centers such as group homes, county-run facilities, and defendant, Youngstown Developmental Center (YDC). Dale was regarded as "higher-functioning" than many of his peers at YDC. Dale was admitted to YDC on three separate occasions in 1992, 2007, and lastly from August 2008 until he died on September 17, 2009. Dale was 56 years old at the time of his death.

{¶ 3} Plaintiff contends that Dale had a documented history of compulsively stuffing food into his mouth and of drinking excessive amounts of fluids, which behavior

---

[1]Plaintiff's decedent shall be referred to as "Dale" throughout this decision.

required close supervision of him during meal times. In addition, as a result of his bipolar disorder, Dale was prescribed antipsychotic medications, the side effects of which include impairment of the swallowing reflex. Plaintiff asserts that defendant had notice of Dale's behavior with regard to food, including prior incidents of choking, but categorized him as needing only "general" supervision, which allowed him to remain unsupervised for up to 15 minutes. Plaintiff asserts that defendant's failure to categorize Dale as a consumer who required "eyes-on" supervision during meal times was a deviation from the standard of care which resulted in Dale stuffing food into his mouth, aspirating food, and choking to death on September 17, 2009.

{¶ 4} Suzanna Polkow testified that from January 2001 to November 2003, she cared for Dale as a nurse's aide at a group home known as New Avenues to Independence.[2] According to Polkow, the care plan for Dale at New Avenues required one-on-one supervision during mealtimes because Dale's behavior around food presented a risk of choking. She testified that Dale would "sneak" food and stuff food into his mouth.

{¶ 5} Marla Martello testified that she worked as direct care staff at a facility known as "Leeda " where Dale was a client from 2003 to 2006. While at that facility, Martello stated that Dale's food was to be cut into one-inch pieces, and that she was required to sit with him, monitor him, and remind him to slow down when he ate because he was at risk for choking. Martello related that Dale would shove food into his mouth and that she had experienced a time when Dale had choked on food in her presence.

{¶ 6} Plaintiff testified that when Dale lived with him, Dale would put too much food into his mouth and that he would "gulp" drinks. According to plaintiff, when he attended an initial placement meeting at YDC, he informed the staff that Dale was at

---

[2]Suzanna Polkow married Dale's cousin after Dale had left New Avenues.

risk for choking and that the Heimlich maneuver had been performed on Dale when he was at Woodside Receiving Hospital in Youngstown, Ohio. Plaintiff was unsure about the timing but estimated that Dale was admitted to Woodside in 1992 and then was placed at YDC later that year. Plaintiff admitted that he did not put any of his concerns about Dale's potential for choking in writing to YDC, but that he attended meetings at YDC about Dale's care plans, and was adamant that he told YDC staff on at least two occasions that Dale was at risk for choking. Plaintiff insisted that Dale's behavior regarding stuffing food continued into 2008 and 2009, and that when Dale would come home for visits during that time, Dale had to be reminded repeatedly to slow down and to not "stuff" food into his mouth.

{¶ 7} Debra Baker, Dale's sister, testified that when she was growing up with Dale, their mother kept a combination lock on the refrigerator and freezer to keep food away from him. With regard to Dale's behavior, Baker testified that in 1992, Dale became paranoid and was admitted to Woodside and then to YDC. Baker visited Dale at YDC at least twice when he lived there from 2008 to 2009. Baker testified that during those visits, Dale continued to exhibit the behavior of gulping and stuffing food, and she would remind him to take small bites and to drink liquids only after he was finished with his meal. Baker acknowledged that she never voiced her concerns to YDC staff.

{¶ 8} Based upon the testimony of defendant's employees who were present in the dining room on the night that Dale choked, including Therapeutic Program Workers (TPW) Teresa Waller, Tiffany Mays, and James Gunther, and licensed practical nurse Dawn Fantone, the incident occurred as follows.

{¶ 9} Eight consumers, including Dale, and two TPWs (Waller and Mays) were present in the "12B side" of the dining room during dinner. The consumers sat in assigned seats at tables. The meal that night was Asian food, consisting of chopped chicken, diced beets, chopped snow peas, and rice. The meals in the dining room were served "family style" whereby the food was brought to the table in large serving dishes

with lids, the consumers used a serving utensil to scoop a portion for themselves, and the serving dish was passed to the next consumer. Watermelon was on the menu for dessert, but it was kept in individual bowls that remained in the kitchen "hutch" until after dinner. Dale finished his Asian food, walked over to the hutch, picked up a bowl of watermelon, and placed the bowl at his assigned seat at the table. Then Dale took his dirty dishes to the kitchen. Dale walked down the hallway to the water fountain and after he took a drink, he started to cough. Fantone heard Dale coughing at the water fountain, encouraged him to continue coughing, and asked him to raise his hand above his head to try to open his airway. Gunther also encouraged Dale to cough. Fantone heard Dale wheezing and then observed that he could not breathe. At that point, Gunther asked Dale if he was choking. When Dale indicated that he was, Gunther began to administer the Heimlich maneuver on Dale and Fantone ran to the phone to call an ambulance. Dale lost consciousness and collapsed in Gunther's arms. Gunther began to administer CPR to Dale after he cleared Dale's airway with his finger. CPR resulted in Dale coughing up some food. Dale regained consciousness and was given oxygen until the paramedics arrived and transported him to the hospital. At some point during transport, Dale lost consciousness and did not survive.

{¶ 10} The coroner's report listed the cause of Dale's death as choking on food. Partially digested food found in Dale's stomach ranged in size from .5 to 2 cm in greatest dimension. Food was also found in Dale's esophagus. (Plaintiff's Exhibit 6.)

{¶ 11} Waller stated that Dale was eating at a normal pace that night. According to Waller, TPWs rotate their attention to all the consumers during meals. Waller stated that Dale was a "regular supervision" consumer and that she was not aware that Dale was at risk for choking.[3] Waller described her understanding of regular supervision as being required to know where the consumer is but allowing for the consumer to be out

---

[3]The terms "regular supervision" and "general supervision" were used interchangeably at trial.

of direct sight for up to 15 minutes. Waller also stated that she had observed Dale eating on hundreds of occasions, that Dale could feed himself, and that he was a high functioning consumer.

{¶ 12} Waller stated that she did not believe that Dale needed more supervision than he received during meal times because he could "help himself." Waller did not believe that Dale ate any watermelon on the night of his death because he began to choke before he sat down to eat it.

{¶ 13} Tiffany Mays also stated that she did not know that Dale was at risk for choking. Mays stated that Dale could eat independently and that if she had noticed that Dale was eating too fast or that the bites he was taking were too large, she would have told him to slow down and to take smaller bites. Mays also stated that in the dining room, the TPWs were constantly observing all of the consumers, and that Dale was not out of sight for 15 minutes in the dining room.

{¶ 14} James Gunther testified that he has worked for defendant for over 25 years and that he had contact with Dale during all three of his admissions, during which time he had observed Dale eating hundreds of times. Gunther stated that he had never observed Dale having problems with food or eating, and that there was no reason to believe that Dale needed eyes-on supervision for meal times. Gunther testified that he did not know that Dale had a history of choking or was at risk for choking.

{¶ 15} Gunther testified that although he is assigned to four clients during his shift, at meal times, he is responsible for all clients in the dining room. Gunther explained that during meal times, the TPWs give consumers a higher level of supervision even if consumers are categorized as needing only regular supervision simply because of the configuration and small size of the dining room.

{¶ 16} Dawn Fantone testified that she administered medication to consumers and that Dale did not have any issues with swallowing his medications, including a large potassium pill. Fantone did not know that Dale had a history of either choking on food

or voracious eating prior to his death. Fantone stated that while in the dining room, consumers were given a heightened degree of supervision, and she likened dining room supervision as closer to eyes-on than regular based upon the size of the dining room and the ratio of staff to consumers. Fantone described the supervision levels at YDC as: "independent," where the consumer is allowed to be alone for 30 to 45 minutes without assistance; "eyes-on," where the consumer must be in view every 15 minutes; and "one-on-one" where the consumer is in a staff member's presence at all times. Fantone described regular or general supervision as requiring a consumer be within eyesight at any given time.

{¶ 17} Shannon Barnett testified that she worked as a clinical dietician at YDC. Barnett stated that she did not know that Dale was at risk for choking, and to her knowledge, Dale did not have any chewing or swallowing dysfunction. Barnett stated that Dale was prescribed a regular textured diet except that his bread products were to be cut into quarters. Barnett stated that the Asian meal that Dale ate on the night that he choked was in the chopped category, meaning that it was cut into smaller pieces than what was required for a regular textured diet.

{¶ 18} Michael Irwin testified that he was defendant's program director. Irwin explained that an Individual Program Plan (IPP) is developed for each consumer at YDC. To generate an IPP, professional and direct care staff complete a comprehensive functional assessment of each consumer which is then discussed at an initial team meeting led by the Qualified Mental Retardation Professional (QMRP). Irwin stated that he was familiar with Dale, that Dale ate independently, and that he never saw Dale stuffing food into his mouth. Irwin believed that Dale did not need "eyes-on" supervision for meal times. Irwin did acknowledge that YDC does not have a separate supervision policy for meals.

{¶ 19} John Pogacnik testified that he was the Quality Assurance Coordinator for defendant and that he investigated Dale's death. As a result of his investigation,

Pogacnick found that defendant's staff levels were adequate, that no staff members were out of place, and that the TPWs were current in their certifications for CPR. In Pogacnik's opinion, defendant's employees acted appropriately that night.

**{¶ 20}** "To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92 (1988), citing *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122 (1966), paragraph one of the syllabus. "The same three elements must be shown to establish a negligence action generally, including a survivorship action predicated upon ordinary negligence or medical malpractice. * * *" *Id.* at ¶ 92. (Internal citations omitted.)

**{¶ 21}** Plaintiff presented the expert testimony of Karl Steinberg, M.D., who is board certified in family medicine with a subspecialty in hospice and palliative medicine. Dr. Steinberg is licensed to practice medicine in Ohio, California, Hawaii, and Florida, and currently serves on the clinical faculty for both the University of California San Diego and the Camp Pendleton Naval Hospital. Most of Dr. Steinberg's practice consists of visiting patients in long-term care facilities, such as nursing homes and residential care settings. Dr. Steinberg estimated that his expert work is equally performed on behalf of plaintiffs and defendants.

**{¶ 22}** Dr. Steinberg noted that Dale's medical records show that he had a history of overly vigorous or overly exuberant food consumption. Dr. Steinberg noted that the Ashtabula County Board of Mental Retardation and Developmental Disabilities (MRDD) records from 2004-2008 show that Dale was on a plan whereby staff was to prepare foods in small portions and to visually monitor Dale as he ate to ensure that he did not take bites that were too large because of the risk of choking. (Plaintiff's Exhibits 1 and 1A.) Dr. Steinberg also testified that at YDC, Dale was prescribed Zyprexa and Haldol, medications which may increase the risk of swallowing problems.

{¶ 23} According to the records that Dr. Steinberg reviewed, Dale was categorized as "regular supervision" and YDC did not mandate any heightened level of supervision for meal times. Dr. Steinberg was critical of YDC for not having a written policy for a heightened level of supervision during meal times. Dr. Steinberg opined that the staff at YDC failed to understand the different levels of supervision and what was required of them. Dr. Steinberg was also critical of Elaine Smith, an occupational therapist employed by YDC, for determining that Dale needed only regular supervision when she identified him as being at risk for choking. Dr. Steinberg opined that the standard of care required YDC to provide eyes-on supervision to Dale during his meals, and its failure to do so was the proximate cause of his death.

{¶ 24} Dr. Steinberg acknowledged that YDC's records show that Dale was at risk for choking but did not show that he had a history of choking; that the dinner that was served to Dale on the night of his death contained foods that were acceptable for Dale to eat; that the size of the pieces of food that Dale choked on would not be expected to completely block an airway; and that nothing in the records shows that Dale ate any watermelon. Dr. Steinberg also stated that there was no observed need to conduct a "swallow study" for Dale, and that there was no record that he had any choking incidents in the 13 months that he lived at YDC before his death.

{¶ 25} Janette Ieraci testified that she is a licensed social worker and that she was in charge of all consumer admissions and family contact for YDC. Ieraci's duties included attending the initial meetings with the families of consumers. According to her notes of those meetings, plaintiff never mentioned that Dale either had choking issues or ate voraciously. According to Ieraci, plaintiff participated in five of the 17 meetings that were held for Dale at YDC. (Defendant's Exhibit A.)

{¶ 26} Ieraci stated that on September 3, 2009, plaintiff participated in an annual meeting about Dale via telephone and there was no mention about any eating problems. According to Ieraci, YDC staff was not informed of plaintiff's concerns of

Dale stuffing food into his mouth, of taking large bites, or of eating too quickly, but if those concerns had been raised, they would appear in Dale's program plan. (Defendant's Exhibits A and B.) Ieraci stated that most of the consumers at YDC eat in a hurry and put a lot of food on their utensils so appropriate bite sizes are something that workers pay attention to and monitor.

{¶ 27} Elaine Smith testified that she worked as an occupational therapist at YDC from 2003 until her retirement in 2009. Smith stated that her usual practice was to review whatever consumer history was available to her at the time. Smith stated that she conducted the occupational therapy portion of the IPP assessment for Dale on August 26, 2008, which included a study of his upper extremity range of motion and eating skills. Smith observed Dale eating and noticed that he took large bites of food. Smith stated that she did not believe that Dale had any particular swallowing problems but she was concerned that he might encounter difficulty if he put too much food in his mouth.

{¶ 28} Smith explained that meal times at YDC are very motivating for many of the residents who may eat quickly or take large bites because they get pleasure from eating. With regard to those residents, Smith felt that staff might need to verbally prompt them to put less food on their spoon or to slow down their pace. Smith stated that general supervision in the dining room requires staff to be in the dining room watching consumers so that staff can intervene if any concerns arise.

{¶ 29} Defendant presented the expert testimony of Laura Trice, M.D., who is board certified in internal medicine and geriatrics and is licensed to practice medicine in Ohio and Kentucky. Dr. Trice works at a facility called Senior Link in Cincinnati, Ohio. Upon review of the records, Dr. Trice opined that defendant met the standard of care, in that YDC's care plan was appropriate for Dale's needs. Dr. Trice stated that the goal of care was to help Dale function as independently as possible, and that defendant was following that standard when it categorized Dale as needing only general supervision.

{¶ 30} Dr. Trice acknowledged that she did not ask to review any records for Dale that were made prior to his 2008 admission to YDC. However, Dr. Trice noted that the care plan from Ashtabula County was similar to the care plan that defendant implemented in that they both required that Dale be monitored to ensure safe bite sizes to prevent the risk of choking. In Dr. Trice's opinion, the most pertinent information to evaluate was what occurred during the 13 months that Dale spent living at YDC prior to his death. Dr. Trice agreed that YDC owed Dale a duty to visually supervise him while he was eating, to ensure that he was taking safe bite sizes and that he was not eating too quickly. However, Dr. Trice opined that defendant met the standard of care on the night of Dale's death, in both the supervision standard and the food that was provided to him.

{¶ 31} Based upon the evidence presented at trial, the court finds the following. Upon admission to YDC in 2008, defendant conducted an initial interview to assess Dale's abilities. Elaine Smith noted that Dale tended to take large bites of food and recommended that he be given general supervision to ensure safe bite sizes. However, Smith also noted that Dale could eat independently, that he had no swallowing problems, and that he did not warrant a swallowing study. The court finds that plaintiff has failed to prove that defendant breached the standard of care when it formulated Dale's IPP and categorized him as needing general supervision. The evidence shows that a team of professionals and staff evaluated Dale's strengths and weaknesses and formulated an appropriate IPP for him based upon his level of skill. Although Dr. Steinberg testified that the medications that Dale was prescribed, including Zyprexa and Haldol, may increase the risk of swallowing problems, the court finds that YDC's determination that Dale did not warrant a swallowing study to be credible evidence that those medications did not, in fact, adversely affect his ability to swallow. The court further finds that plaintiff has failed to prove that defendant breached any standard of care by not obtaining records from Ashtabula County MRDD. Indeed, YDC's practice of

formulating an IPP for each consumer by evaluating the consumer and obtaining input from family members met the standard of care in this case.

**{¶ 32}** Although defendant's general supervision guidelines provided that Dale could be left unsupervised for up to 15 minutes, the evidence shows that Dale was being supervised in the dining room, that he was eating at a normal pace, and that staff members came to his aid immediately when they heard him coughing. The court finds that YDC's staff gave appropriate supervision to Dale based upon his demonstrated level of ability. The court further finds that defendant's staff acted appropriately once Dale began to choke. Moreover, the meal that Dale was served was cut into pieces the size of which plaintiff's expert conceded would not block an airway.

**{¶ 33}** The court finds that plaintiff has failed to prove either that defendant breached any duty of care or that its actions were a proximate cause of Dale's death. For the foregoing reasons, the court finds that plaintiff has failed to prove any of his claims by a preponderance of the evidence and, accordingly, judgment shall be rendered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ROGER POLKOW, Exec., etc.

    Plaintiff

    v.

YOUNGSTOWN DEVELOPMENT CENTER

    Defendant

Case No. 2011-01291

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

{¶ 34} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
CLARK B. WEAVER SR.
Judge

cc:

Eric A. Walker                              Robert A. Pecchio
Kristin S. Boggs                            2305 East Aurora Road, Suite A-1
Assistant Attorneys General                 Twinsburg, Ohio 44087-1940
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

002
Filed October 9, 2012
Sent to S.C. Reporter February 28, 2013